12 CV 9413

JUDGE CASTEL

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

THEODORE F. SCHROEDER,

      Plaintiff,

    v.

BRIAN S. COHEN and
PINTEREST, INC.,

      Defendants.

**COMPLAINT**

Civil Action No.     DEC 27 2012

ECF Case     U.S.D.C.
     CASH.

**JURY TRIAL DEMANDED**

Plaintiff, Theodore F. Schroeder ("Schroeder"), by and through his undersigned counsel,

brings this Verified Complaint against Defendants Brian S. Cohen ("Cohen") and Pinterest, Inc.

("Pinterest") and alleges the following:

### INTRODUCTION

1.     This is an action for, among other things, misappropriation, unjust enrichment and

breach of fiduciary duty arising out of Defendants Cohen and Pinterest's illegal use of Plaintiff's

ideas and information technology in developing www.Pinterest.com.

2.     Plaintiff originated the ideas that led to the popular, ever-growing Pinterest

website.  In 2005, supported by two friends, Plaintiff conceived a web application that would

allow Internet users to share information about themselves in ways very different from the

popular social networks like Friendster, MySpace and Facebook by focusing on such users'

interests posted to such user's "board."  Plaintiff brought his fellow Columbia law school friends

on as partners to help him develop the project and, later, Cohen, a self-proclaimed

"Entrepreneurial Mentor," became a partner with the other three owners.  Plaintiff invested the

most amount of money of the four stakeholders and, by far, the most amount of time by

developing his ideas into a functioning website and growing community with thousands of users.

3.      While becoming business partners with Plaintiff and over the course of most of 2007, Cohen learned about Plaintiff's ideas and all related technology and business plans. Cohen worked with Plaintiff and Plaintiff's two colleagues to further develop Plaintiff's ideas. Cohen caused the project to deadlock so he could steal the core ideas for himself and freeze out the Plaintiff from reaping any benefits.

4.      It was not until March 2012 that Plaintiff learned that Cohen played a material role in the early stages of Pinterest when Plaintiff read an article in which Cohen bragged about being Pinterest's "first investor" and meeting the founders of Pinterest at a business plan competition. What Cohen did not disclose in that article was that in addition to being the first investor, he had stolen the ideas that underlie Pinterest in violation of an understanding not to disclose or otherwise share Plaintiff's ideas.

5.      It would be unconscionable for Defendants to retain the value of the Plaintiff's ideas and labor without making the appropriate remuneration to him.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction over this matter under 28 U.S.C. §1332(a) because this matter is between citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

7.      This Court has personal jurisdiction over Defendants because a substantial part of Defendants' misconduct that gives rise to this action occurred in this District.

8.      This Court is a proper venue under 28 U.S.C. §1391(b) because this Court is in a judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, and because Defendants are subject to personal jurisdiction in this District.

## PARTIES

9.      Plaintiff Schroeder is an individual and a resident of the State of New Jersey.

10.      Defendant Cohen is an individual and a resident of the State of New York.  Upon information and belief, Cohen regularly conducts business in this District and maintains at least one residence in this District.

11.      Defendant Pinterest is a private corporation organized and existing under the laws of the State of Delaware.  While Pinterest's principal place of business is located in the State of California, it began its operations and continues to routinely conduct business in the State of New York.  The Pinterest website has grown quickly in popularity, reaching over 10 million unique users per month, faster than any other individual site.  In an article in the *Wall Street Journal* in April 2012, Pinterest was valued at $1.5 billion.

## FACTUAL ALLEGATIONS

**Plaintiff Develops a Company and Functioning Website to Launch,**
**Find, Discover and Discuss Products, Services and Ideas**

12.      In 2005, while attending Columbia Law School, Plaintiff and a fellow law school classmate, Brandon Stroy ("Stroy"), worked together to develop an idea for a socially networked bulletin board where users came together to share their locations with their friends.  At the time, no such website existed.  Plaintiff and Stroy pitched the idea to third parties in an attempt to obtain financing, but Plaintiff realized that he would be better off if he had not only the idea, but also the technological expertise to bootstrap the idea into a web application.

13.      Plaintiff proceeded to learn how to develop programs and applications by teaching himself computer programming.  Indeed, at the time, Plaintiff spent more than 2,000 hours teaching himself all of the necessary computer and programming skills while developing an appropriate application for his idea.

3

14.     Plaintiff soon enlisted another former classmate, William Bocra ("Bocra"), to help further develop his idea, create a business model and handle administrative matters for the project.  The project became formalized through the creation of a company called RendezVoo LLC ("RDV").  Plaintiff was given a 65% majority interest in RDV and was named the President of RDV because it was his original idea and also because he took sole responsibility for the development of the web application and all technical processes.  Plaintiff retained responsibility for and performed all technical work in connection with the development of RDV's website: www.Rendezvoo.com.

15.     RDV's operating agreement made clear that the members of the company owed each other certain fiduciary duties and expressly prohibited the unilateral taking of any corporate opportunity by any member.   Consistent with his majority interest and RDV's operating agreement, Plaintiff invested substantially more money and time into the company than Stroy and Bocra.

16.     More than a year after Plaintiff's development of the idea, the first version of www.Rendezvoo.com was released to the public.  Plaintiff developed and built every technical aspect of www.Rendezvoo.com, and the large concepts underpinning the web application originated with Plaintiff.

17.     Seeing a bigger opportunity with more content for users to browse, Plaintiff eventually convinced Stroy and Bocra during 2006 that the scope of RDV should be expanded in a second version to have its social networked bulletin boards share more than its users' locations; users could share any interest they had, which, as memorialized in RDV's business plan, RDV was "a website where people meet to share opinions, views, items and tastes on a variety of subjects – products, services, events, politics, economics – nearly anything of human interest."

4

Plaintiff rebuilt the application to address this new focus and introduced the new concepts to the existing user community in an alpha release in August 2006.

18.     Version 2 of RDV's web application ("RDV Version 2") provided "boards" for users to post their interests. Plaintiff also designed and implemented an infinite scroll to make it easier for users to browse large amounts of data. When RDV Version 2 was launched, standard web technologies provided only inefficient ways to browse large amounts of data. Infinite scrolling allows users to scroll through content on a seemingly single, long page rather than open separate pages to retrieve additional content. At the time, the concept of infinite scrolling was in its infancy. Without Plaintiff's knowledge, these two key concepts, in addition to the ideas underpinning RDV itself, found their way to Pinterest.

19.     By mid-2006, Plaintiff had personally invested more than 5,000 hours developing RDV's website and applications. Plaintiff, who graduated from Columbia Law School in May 2006, delayed taking the bar examination in the summer of 2006 and also delayed commencing his legal career so that he could focus solely on RDV and generating additional interest in it. Unlike Plaintiff, Stroy, who graduated law school at the same time as Plaintiff, immediately began his legal career at a large law firm, while Bocra focused most of his time on a family business and launching a restaurant.

20.     By the end of 2006, excited about the promise of RDV Version 2, Plaintiff, Stroy and Bocra began to look for capital to further advance the RDV project. That search led to Plaintiff's introduction to Defendant Cohen who was then affiliated with New York Angels – an independent consortium of angel investors in New York City that works with local entrepreneurs.

**Presentation of www.Rendezvoo.com to Defendant Cohen**

21.     In January 2007, Plaintiff, Stroy and Bocra met Cohen in New York City to present RDV's concepts, business model and business plan.  Plaintiff furnished Cohen with a copy of the RDV business plan.  That business plan, drafted the prior year as Plaintiff was developing RDV Version 2, described the site as one "where people meet to share opinions, views, items and tastes on a variety of subjects – products, services, events, politics and economics – nearly anything of human interest."  At the time of the first meeting with Cohen, RDV had an operating web application with more than 5,000 users.

22.     After the initial meeting in January 2007, Cohen stated that he was happy to meet with the RDV team again to help "polish [their] marketing and pitch."  Thereafter, the group met again on January 29, 2007 in New York City.  During this meeting, the parties discussed taking RDV's web application and focusing it more narrowly on new ideas, products and services because, similar to their first meeting with New York Angels, Cohen could not contemplate how people would be interested in viewing other people's interests.  Cohen in fact exclaimed multiple times in these meetings that he did not get the concept.

23.     After the January 29, 2007 meeting, Plaintiff, Stroy and Bocra discussed ways to make RDV's website and business plan more in line with what was discussed during the two meetings.  It was agreed that the scope of www.Rendezvoo.com would be narrowed.  So, Plaintiff returned to the proverbial drawing table and worked diligently to develop a more narrowly tailored web application that was based upon the concepts and ideas developed in RDV Version 2 during 2006 – prior to meeting Cohen but were more attractive and understandable to Cohen.  Their efforts were successful.  Plaintiff's technological efforts led to the creation of what was referred to within RDV as the "Launchbed" platform.

6

24.     Plaintiff saw the positive aspects of the Launchbed platform and contemporaneously remarked: "[The] one beauty of this thing if we pull it off is the ability for the launcher to interact with those users checking it out" and that "you as content producer/launcher get to launch your art/site/product and control the branding message that results."

25.     Indeed, the initial Launchbed.com branding statement identified that "Launchbed is the website and user community where people and companies can launch new products, services, ideas, and media in order to ignite word-of-mouth efforts and receive targeted feedback."

26.     Plaintiff, along with others from RDV, provided the Launchbed concept and business model to Cohen on March 16, 2007 – two months after their first meeting.

27.     When discussing the Launchbed model in an email on April 29, 2007, Cohen recognized that Launchbed "provides the announcee with a branded, centralized web launch presence and a sophisticated platform of customer-centric Web 2.0 community tools to make the launch more effective.  **It's the first interactive-user driven launch environment for everything 'new'** that provides for immediate customer inquiry and feedback."  (Emphasis in original).

**Cohen Joins RDV and Enters Into A Fiduciary Relationship With Plaintiff and Others**

28.     In May 2007, Plaintiff, along with Bocra and Stroy, began discussing offering partnership to Cohen.  By that time, Plaintiff had originated the idea behind RDV and performed all of the technical developmental tasks in creating the RDV website, and the RDV site was publicly available on the Internet and had a community of over 5,000 users.

7

29.     At the time Cohen was being considered as a partner, RDV was organized as a limited liability company with its ownership interests allocated 65% to Plaintiff and 17.5% to both Stroy and Bocra.  Plaintiff, Stroy and Bocra proposed to Cohen that if he were to join the company, Plaintiff would reduce his ownership interest to 46% and Cohen, Stroy and Bocra would each own 18%.  Plaintiff maintained a substantial ownership of RDV in recognition of his ideas and efforts.  No one objected to Plaintiff's larger financial position vis-a-vis the other members of RDV.

30.     On May 24, 2007, realizing the potential success of RDV and its concepts, Cohen accepted RDV's offer.  Cohen noted that "[a]s for my role, I feel comfortable being the company's chairman with some operational authority and responsibility."  The following day, Cohen became RDV's new Chairman and Chief Executive Officer.

31.     At all relevant times, Cohen lacked the training and skill to perform the technical work Plaintiff was performing in furtherance of the project.

32.     As part of Cohen joining RDV, Cohen agreed to be equally bound to the requirements and restrictive covenants in RDV's operating agreement, including not taking Plaintiff's ideas or using any of RDV's work product.  Cohen's pledges of commitment to Plaintiff, Stroy and Bocra, his acceptance of RDV's business plan and Plaintiff's explanations of how www.Rendezvoo.com worked, his access to RDV's management information and procedures, and his understanding that he would be compensated when the website was successful, created a duty of good faith and fair dealing as well as other fiduciary obligations between Cohen and Plaintiff, Stroy and Bocra.

33.     Cohen also promised to contribute $20,000 to the project.  (Cohen never paid this amount and, instead, only contributed a few thousand dollars.)

34.    As the parties worked to refine their revised business model, Cohen aptly described RDV's objectives: "our interest is to provide the first news release distribution of new launches to the millions (we need this number to be successful) of reasonably sophisticated web users who want to know immediately about new products and do not want or need to wait for the interpretation from the press and analyst communities.  . . . We are creating the first to know 'people wire service' for the masses on the Internet!  Thus Scoopwire.com began to make more sense."[1]

35.    Skoopwire.com ("Skoopwire"), which is the brand name selected by the four partners for the original Launchbed platform, was the more narrowly-focused version of RDV Version 2.  After a series of meetings among Cohen, Plaintiff, Stroy and Bocra regarding RDV in the first half of 2007, Plaintiff, along with Stroy and Bocra, continued to refine many of RDV's concepts and built an initial prototype of what became Skoopwire.  During this process, Plaintiff taught Cohen about the social networking niche in which Rendezvoo/Skoopwire operated.  During this time period, in response to Cohen's strong urging because he never understood the basic concept of sharing interests, Plaintiff, Stroy and Bocra agreed to take down RDV Version 2 in order to focus on Skoopwire.

36.    Skoopwire was to be a free, direct-to-customer news wire connecting businesses to bloggers, sophisticated customers and journalists wanting the easiest access to information about new products and services.  Skoopwire was designed to make it easy and convenient to launch, find, discover and discuss new products and services before they were covered in the mainstream media.

---

[1]  Issues obtaining a domain name resulted in scoopwire becoming skoopwire.

9

37.     At the same time the parties were working on the web design for Skoopwire.com, Plaintiff was working to develop Skoopwire's technology plan.  In June 2007 (and several times thereafter), Plaintiff distributed and spoke about Skoopwire's technology plan with Cohen. Skoopwire's technology plan included information regarding the architecture and platform for the website together with an analysis of how the website would permit interaction between Skoopwire's customers and a collection of customer data.

38.     When the parties were discussing the technology plan for Skoopwire.com, they also discussed Plaintiff's "usability principles."   Plaintiff identified that one key aspect of Skoopwire was that, like RDV Version 2, the website intended to "[l]et the user design the site, not the designer."  In other words, Plaintiff's idea was to have those using the website determine what was posted to the website.  If a user was interested in a product, such user would post that product on Skoopwire to share their interest.

**The Parties Incorporate Skoopwire and Move to Further Define Their Relationships with Each Other and the Idea Behind Skoopwire.com**

39.     On June 29, 2007, the parties restructured RDV when they formed and incorporated Skoopwire Media Associates, Inc. ("SMA") in Delaware.  It was Cohen's idea to use SMA rather than the RDV limited liability company because, as he stated at the time, that it would be more attractive to investors to use a corporation instead of a limited liability company. However, the nature of the relationship and fiduciary duties between those involved in RDV/SMA remained unchanged by the restructuring.

40.     On July 3, 2007, after much work and analysis, the parties privately launched the website Skoopwire.com for testing, customer review and analysis.

41.    Beginning in July 2007 and continuing through October 2007, the parties tested the Skoopwire.com website with family members, friends, and others.  Skoopwire compiled and used this information to further develop and refine the website.

42.    By September 2007, Cohen was representing himself to focus groups and potential customers as the Chairman and Chief Executive Officer of Skoopwire.  In one such email correspondence, Cohen described Skoopwire.com as follows:  "For some time I wondered if there could be a **free** wire service (complimentary to Businesswire) that would focus on ONLY new products and services (revenue producing releases) introductions and be more directed at bloggers and sophisticated customers.  Additionally, as the role of PR professionals have evolved to talking more with customers, could such a wire service also include an interactive conversation browser… That's what we have created.  Skoopwire is it's [sic] name."

43.    Plaintiff, Bocra and Cohen agreed that Skoopwire was "a free, direct-to-consumer newswire connecting businesses to bloggers, sophisticated customers and journalists wanting the easiest access to information about new products and services.  Skoopwire makes it easy and convenient to launch, find, discover and discuss these new products and services before they are covered in the mainstream media."  Skoopwire.com differed from RDV Version 2 in essence in that RDV Version 2 was less focused on new products and allowed users to post anything of interest to them whether "new" or not.

**Cohen Creates Conflicts Over Ownership Interests and Deadlocks The Company**

44.    In September 2007, after the focus groups returned favorable results and the parties were soon looking to launch www.Skoopwire.com to the public, Cohen became upset with what he perceived to be Stroy's lack of involvement in the project.  Cohen believed his role as Chairman and Chief Executive Officer of Skoopwire warranted a greater ownership position

11

than his present, equal 18% share with Stroy.  In fact, Cohen wanted to push Stroy out of Skoopwire entirely.  However, Plaintiff and Stroy had agreed in 2005 that Stroy would always maintain a reduced equity interest in the project even though Stroy no longer was required to contribute to RDV.  In other words, Plaintiff had an agreement that he had to honor with Stroy.

45.     By early November 2007, Cohen was still unhappy with his ownership share. When Plaintiff was attempting to finalize a shareholders agreement that maintained Stroy as an owner, Cohen balked at the idea.  In fact, in a November 5, 2007 email, Cohen stated that the "shareholders agreement is the least important issue on my mind.  After what you said at our breakfast two weeks ago, I have found it extremely difficult to believe that I could trust you to trust Bill and I going forward.  Nothing else matters.  You and I must meet (again) to see if an ONGOING trusting relationship can be truly found."

46.     Cohen, fully realizing his efforts were causing tension between him and Plaintiff, persisted in arguing for Stroy's ouster and an increased financial interest in Skoopwire.  Those efforts, in combination with Plaintiff, Stroy and Bocra giving Cohen certain rights under the organizational documents of RDV and Skoopwire, effectively deadlocked the project and created significant strains in the relationships among those involved.  Cohen was well aware that, at the time Cohen created the conflicts, Plaintiff had started work at a law firm as a junior lawyer with substantial work obligations partly at the urging of Cohen and that Plaintiff and his wife recently had their first child.  Cohen also knew that Stroy and Bocra, who were not as involved in the project as Plaintiff, continued to be burdened pursuing their careers outside of RDV and Skoopwire Cohen had also never fulfilled his promise to contribute $20,000 to the project.

47.     Cohen's efforts to deadlock the project and freeze Plaintiff from pursuing his own ideas were successful.  By early 2008, the parties started contemplating a liquidation of

12

Skoopwire. Cohen, concealing his developing plan to steal Plaintiff's ideas, facetiously stated in an email: "Frankly, I'm still saddened that such a marvelous idea and execution is lost forever."

48.     Several discussions took place, including in person meetings in New York City, to have those involved reconcile their differences. At no time did Cohen disclose his plan to take Plaintiff's ideas and work product and use them for his own gain.

49.     As part of the proposed liquidation agreement that was being circulated among the group by email, the parties intended that Plaintiff, Bocra, Stroy and Cohen would not develop, pursue, or otherwise work on or cause or assist another to develop, pursue or otherwise work on an entity or business reasonably related to the purposes, goals, aims and business models of RDV or Skoopwire.

50.     In a July 1, 2008 email to Plaintiff, Cohen stated: "I have absolutely NO interest in PROFITTING from your specific design work on Skoopwire."

51.     Cohen's plan to take Plaintiff's ideas and work product without compensating Plaintiff continued. Several requests by Plaintiff for the group to sign the liquidation agreement went without a response. By that time, Cohen knew that in order to steal Plaintiff's ideas, Cohen could not sign any agreement that would prevent or limit his ability to take Plaintiff's ideas.

52.     The parties never executed the liquidation agreement and www.Skoopwire.com was never officially released to the public.

53.     After those involved in the project moved on with their respective lives and careers in mid-2008, Plaintiff continually contemplated how he could make use of his ideas and work product.

54.     By then, Plaintiff had devoted almost four years of his life and thousands of hours working on his ideas and performing all of the technical requirements to enable Rendezvoo.com

13

and Skoopwire.com to be functional -- without any compensation.  Plaintiff had also contributed more money to the venture than Cohen or anyone else.

55.    Out of a concern that Cohen would sue if Plaintiff tried to make use of what Plaintiff himself had created and designed, Plaintiff kept putting any ideas of continuing his efforts to the side.

**Cohen's Faustian Deal With the Founders of Pinterest**

56.    As it turns out, Cohen wasted little time in stealing Plaintiff's ideas and using those ideas for his personal gain.  In 2009, the year after Cohen caused the deadlock in RDV/SMA, Cohen had given Plaintiff's ideas and applications to young entrepreneurs who, unlike Cohen, had the ability to fulfill Plaintiff's role of performing the technical aspects.

57.    After Pinterest became publicly available, several persons familiar with Plaintiff's ideas and Rendezvoo.com told him about the similarities between the two websites.  It did not take long for Plaintiff to confirm what he had been told.  The similarities were almost too coincidental.  Pinterest was nearly exactly what Plaintiff conceived as RDV Version 2.  At that time, Plaintiff had no idea and could not have known that Cohen was in anyway involved with Pinterest.

58.    Indeed, it was not until March 2012 that Plaintiff learned about Cohen's successful scheme to steal Plaintiff's ideas and use them for his own gain despite promises and an obligation not to do so.

59.    On March 11, 2012, an article entitled "Pinterest's First Investor Explains the Secret to the Startup's Success" was published.  At or about the time the article was published, Plaintiff obtained a copy of that article.  In the article, Cohen was quoted as saying: "I was Pinterest's first investor."  http://mashable.com/2012/03/11/pinterest-first-investor/ (last visited

June 18, 2012).  In the article, Cohen claimed that he happened upon Pinterest's founders Ben Silbermann and Evan Sharp "at a business plan competition where Angel investors 'forage for new opportunities'."  (*Id.*) (quoting Cohen).  Cohen then described in the article what it was like to work with Pinterest in the early days and how the idea for Pinterest blossomed out of Tote, a different project Silbermann was working on.

60.     Cohen said that he was a mentor to Silbermann and that Cohen "marveled at how Silbermann listened to advice from investors, customers and partners" and that "they were incredibly open for input.   That's really important as an instructive element for social entrepreneurs - anyone - [they were open] to those Angel investors who care deeply about their success." (*Id.*) (quoting Cohen).

61.     Cohen noted that Silbermann's first project was an app called "Tote." Silbermann's "Tote" app was the first women's fashion catalog on the iPhone and allowed users to tag specific items for later viewing.   Cohen stated that Silbermann recognized that by "grabbing" items on the app, women were sharing their tastes.  Cohen claimed that the grabbing tool "became very useful and was the early incarnation of Pinterest."

62.     Cohen did not reveal that he had taken Plaintiff's ideas and worked with Silbermann to develop Pinterest.  (Cohen lacked the technical skills to write code or otherwise develop website applications.)

**Similarities Between RDV Version 2 and Pinterest**

63.     Pinterest allows users to pull images from elsewhere on the Internet to generate "pins," which they then compile into various topic boards, creating organized collages of their pins.  Each pin also functions as an immediate link to its original Internet source, such as a shopping site where users can immediately purchase the item pictured, a blog post, or an article.

15

64.     Pinterest allows users to view most popular pins on the site and the boards that other users have created, without any external marketing input.  The site invites users to "like" pins and re-pin things, creating a microcosm of image-sharing based solely on user-created content and "word of mouth" through social networking.

65.     In the March 11, 2012 article, Cohen falsely stated that he did not know where the concept of pinning on boards came from, but that he would "imagine it is that [Silbermann] saw customers/women needing to have a contrast of all the things they were buying organized" and that it "lent itself naturally to boards."  (*Id.*) (quoting Cohen).  Cohen also falsely claimed in the article that the Pinterest site "came out of nowhere."  (*Id.*) (quoting Cohen).  Contrary to his claims, Cohen knew exactly where the idea for the Pinterest site originated – with the Plaintiff and his development of Version 2 of Rendezvoo.com.

66.     Some of the key similarities between the RDV Version 2 of Plaintiff and Cohen's subsequent Pinterest site include:

- o   RDV's Version 2 provided a website for users to post their interests for their friends and the other users of the site to see.  This concept was noted in RDV's business plan, made part of its business model and evidenced by a functioning web application that had thousands of users.

- o   The goal of RDV was to connect things that mattered to a user with other users (i.e., show a user's identity via photos, hyperlinks and text descriptions of things that matter to them to their friends) while providing a place for a product or event promoter to gain visibility for its product.  Pinterest is nearly an exact match of this same concept.

- o   Skoopwire, the off-shoot of RDV designed by Plaintiff, focused particularly on product discovery through socially networked product launches.  The goal was that any new product launch would be covered on Skoopwire by its users and shared with friends of that user, thereby igniting word of mouth about the product launch.  Pinterest's primary business model as described in the media is product discovery through friends.

16

- o The user interface of RDV Version 2 adopted a user interface technique called the "infinite scroll" much before the technique was used by any mainstream website. Pinterest uses the infinite scroll technique, which has proven extremely successful in enticing users to remain on the website.

- o In RDV Version 2, the main user interface (the "Board") and each user's profile page (that user's "Board") adopted a concept that is now central to Pinterest. (Rendezvoo user's posted to the Board and their board, while Pinterest users "pin" photos and descriptions to their virtual corkboard.)

- o Recognizing the value of female users, RDV Version 2 adopted a pink and purple color scheme to attract female users. Pinterest's user community is predominantly female because of practices that target females.

67.    The website for New York Angels (www.newyorkangels.com), the firm Cohen operated through in his early dealings with Plaintiff, lists Pinterest as being added to that firm's portfolio in 2009 – months after Cohen, the self-proclaimed "first investor" in Pinterest, froze Plaintiff from pursuing Rendezvoo and Skoopwire and stole Plaintiff's ideas. Pinterest's website, essentially RDV Version 2, was launched in March 2010.

68.    Upon information and belief, Cohen remains an investor in Pinterest with a significant financial interest in the company.

## CAUSES OF ACTION

### Count One
### Unjust Enrichment (Plaintiff v. Cohen and Pinterest)

69.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as though set forth fully herein.

70.    Defendant Cohen has promoted himself as the first investor in Pinterest and as having worked with the founders of Pinterest in developing the site.

71.     Pinterest is an increasingly popular Internet site, which was founded on ideas and concepts devised by Plaintiff, although Cohen has stated that the concepts behind Pinterest were born "out of nowhere."

72.     As a result of Defendants' actions as described in this Complaint, Defendants have been enriched at the expense of Plaintiff.

73.     As a result of Defendants' actions as described in this Complaint, Plaintiff has been deprived of a valuable benefit.

74.     Defendant has benefitted, and will continue to benefit, from his involvement with Pinterest due to the current and likely continuing success of Pinterest.

75.     Defendant has benefitted to the detriment of Plaintiff as Cohen used the concepts of Plaintiff without ever crediting and compensating him.

76.     Defendants cannot establish any justification for their unjust enrichment at the expense of Plaintiff.

77.     The actions of Defendants described in this Complaint have at all times relevant to this action been willful and/or knowing.

78.     Cohen has not acknowledged that the idea that forms the lynchpin of Pinterest was taken from his previous ventures with Plaintiff, and thus equity and good conscience require that Plaintiff be remunerated for his contributions and concepts.

79.     As a direct and proximate result of the actions of Defendants alleged in this Complaint, Plaintiff has been irreparably harmed and has suffered monetary damages in an as yet undetermined amount.

## Count Two
### Misappropriation (Plaintiff v. Cohen and Pinterest)

80.     Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as though set forth fully herein.

81.     Plaintiff took steps to maintain the secrecy of all related technology and business management information.  The technology and business management information were valuable to Plaintiff and Cohen.

82.     The technology developed by Plaintiff was not easily acquired or duplicated by third parties.

83.     Cohen was the Chairman and Chief Executive Officer of RDV and Skoopwire.  In this role, he was involved in many conversations with Plaintiff and the other members of RDV/Skoopwire, and he was exposed to their confidential and proprietary information, including but not limited to the business and technology plans for RDV/Skoopwire.

84.     Cohen also was privy to the anticipated use of the sites and the target markets and demographics.   As Chairman and CEO, Cohen also was aware that everyone involved in RDV/Skoopwire intended that the information was to be kept confidential and that, in particular, it would not be used to develop or assist another to develop a business with similar goals and business models.

85.     Despite this understanding, Cohen entered into a relationship with Pinterest, providing the founders with the proprietary information that he acquired through his association with RDV/Skoopwire and upon which Pinterest was formed.

19

86.    Cohen misappropriated not only confidential information, but also business opportunities for the other members of RDV/Skoopwire.   Cohen diverted those business opportunities to Pinterest.

87.    Defendants' actions as described in this Complaint constitute misappropriation of Plaintiff's trade secrets.

88.    The actions of Defendants described in this Complaint have at all times relevant to this action been willful and/or knowing.

89.    As a direct and proximate result of the actions of Defendants alleged in this Complaint, Plaintiff has been irreparably harmed and has suffered monetary damages in an as yet undetermined amount.

## Count Three
### Misappropriation of Skills and Expenditures (Plaintiff v. Cohen and Pinterest)

90.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as though set forth fully herein.

91.    The technology developed by Plaintiff required significant labor, skill, and expenditures.

92.    Plaintiff took steps to maintain the secrecy of all technology that he developed as well as all business management information.   The technology and business management information was valuable to Plaintiff and Cohen.

93.    The technology developed by Plaintiff was not easily acquired or duplicated by third parties.

20

Case 1:12-cv-09413-PKC   Document 1   Filed 12/27/12   Page 21 of 25

94.     As Chairman and Chief Executive Officer of RDV and Skoopwire, Cohen was exposed to confidential and proprietary information, including but not limited to the business and technology plans for RDV/Skoopwire.

95.     Cohen entered into a relationship with Pinterest, providing the founders with the proprietary information that he acquired through his association with RDV/Skoopwire and upon which Pinterest was formed.

96.     Cohen misappropriated technology and information that was the result of Plaintiff's labor, skill, and expenditures, and Cohen did so in bad faith.

97.     Cohen's misappropriation of Plaintiff's labor, skill, and expenditures was for his own benefit.

98.     Cohen misappropriated not only confidential information, but also business opportunities for the other members of RDV/Skoopwire.   Cohen diverted those business opportunities to Pinterest.

99.     Cohen and Pinterest gained an unfair advantage when they used the technology developed by Plaintiff, which was the result of Plaintiff's labor, skill, and expenditures.

100.    Defendants' actions as described in this Complaint constitute misappropriation of Plaintiff's labor, skill, and expenditures.

101.    The actions of Defendants described in this Complaint have at all times relevant to this action been willful and/or knowing.

102.    As a direct and proximate result of the actions of Defendants alleged in this Complaint, Plaintiff has been irreparably harmed and has suffered monetary damages in an as yet undetermined amount.

21

## Count Four
### Promissory Estoppel (Plaintiff v. Cohen)

103.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as though set forth fully herein.

104.    In an email dated July 1, 2008, Cohen unambiguously promised Plaintiff that he would not take his ideas underlying Skoopwire for his own benefit.

105.    Cohen intended Plaintiff to rely on that promise and it was foreseeable that Plaintiff would rely on the promise.

106.    Plaintiff reasonably relied on Cohen's promise not to take his ideas to his detriment.

107.    As a direct and proximate result of the actions of Defendants alleged in this Complaint, Plaintiff has been irreparably harmed and has suffered monetary damages in an as yet undetermined amount.

## Count Five
### Breach of Fiduciary Duty (Plaintiff v. Cohen)

108.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as though set forth fully herein.

109.    Due to his position as Chairman and Chief Executive Officer of RDV/Skoopwire, Cohen owed fiduciary duties to Plaintiff.  Cohen was in a position of trust and confidence within the company, and Plaintiff reposed trust and confidence in Cohen.  In so doing, Cohen knowingly gained a superiority and influence over Plaintiff.

110.    Plaintiff relied on Cohen to act in the best interest of RDV/Skoopwire and Cohen had full knowledge of Plaintiff's reliance.

111.    Cohen breached his fiduciary duties by misusing and misappropriating Plaintiff's confidential and proprietary ideas, plans, and information for his own personal gain and that of Pinterest.

112.    Cohen further breached his fiduciary duties by violating the trust placed in him by using the concepts and business plans he learned at RDV/Skoopwire to begin at least one other venture, claiming ignorance as to the origins of these ideas and neglecting to give credit to Plaintiff who developed these concepts.

113.    The actions of Defendants described in this Complaint have at all times relevant to this action been willful and/or knowing.

114.    As a direct and proximate result of the actions of Defendants alleged in this Complaint, Plaintiff has been irreparably harmed and has suffered monetary damages in an as yet undetermined amount.

## Count Six
## Aiding and Abetting Breach of Fiduciary Duty (Plaintiff v. Pinterest)

115.    Plaintiff repeats and realleges the allegations set forth in the preceding paragraphs as though set forth fully herein.

116.    Defendant Cohen owed fiduciary duties to Plaintiff by virtue of their business relationship in RDV/Skoopwire, of which Defendant Pinterest was aware.

117.    Pinterest had actual knowledge of Cohen's breach, knowingly participated in the breach, and provided substantiated assistance to Cohen by basing the venture on ideas and concepts that were misappropriated and constituted confidential and proprietary information, and by failing to give credit to the originators of these ideas.

118.    Pinterest is profiting from and will continue to profit from these ideas.

3354570v1

119.    As a result of Pinterest's knowing participation in Cohen's breach of fiduciary duties, Plaintiff has been damaged in an amount to be determined at trial, including the current and potential profits of Pinterest.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor, and that the Court grant:

a.    an award of compensatory damages substantially in excess of $75,000;

b.    a constructive trust over earnings derived from Pinterest;

c.    an award of pre- and post-judgment interest at the legal rate;

d.    an award of the costs and disbursements of this action, including reasonable attorneys' fees; and

e.    such other and further relief as the Court deems just and proper under the circumstances.

3354570v1

MONTGOMERY, McCRACKEN,
WALKER & RHOADS, LLP

Dated:  December 27, 2012

Richard L. Scheff - 1206
Sidney S. Liebesman - 8444
Charles Palella - 6642
437 Madison Avenue
29th Floor
New York, NY 10022
Tel.: (212) 867-9500
Fax: (212) 201-1939

*Attorneys for Plaintiff*

OF COUNSEL:

Steven Pachman
K. Carrie Sarhangi
William B. Conaty
MONTGOMERY, McCRACKEN
    WALKER & RHOADS, LLP
123 S. Broad Street
Philadelphia, PA 19109
Tel.: (215) 772-1500
Fax: (215) 772-7620


R. Montgomery Donaldson
Lisa Zwally Brown
MONTGOMERY, McCRACKEN
    WALKER & RHOADS, LLP
1105 N. Market Street
15th Floor
Wilmington, DE 19801
Tel.: (302) 504-7800
Fax: (302) 504-7820

3354570v1